# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Civ. No. 15-2063 (DWF/JJK) |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION** |
| Thomas Lorenzo-Perez, | |
| Respondent. | |

Craig R. Baune, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Petitioner.

Katherine M. Menendez, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, MN, for Respondent.

JEFFREY J. KEYES, United States Magistrate Judge

This case is before the Court on the Government's Petition To Determine The Present Mental Condition Of An Imprisoned Person Under 18 U.S.C. § 4245. (Doc. No. 1.) This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that the Petition be granted.

## I.     BACKGROUND

### A.     Hearing

The Court held a hearing on this matter on June 1, 2015, at the Federal Medical Center, Rochester, Minnesota ("FMC Rochester"). Dr. Melissa Klein, a

Psychologist at FMC Rochester, and Dr. Ubaldo Bocanegra, a Staff Psychiatrist at FMC Rochester, testified on behalf of the government. Respondent Lorenzo-Perez was present at the hearing, but chose not to testify.

Counsel stipulated to the qualifications of the testifying doctors. Counsel also stipulated to the admission of the following government Exhibits:

1. Curriculum Vitae of Dr. Melissa J. Klein;
2. Mental Health Evaluation, signed March 27, 2015, with referral letter from Warden, B.R. Jett (Exhibit B to Petition);
3. Psychiatric Evaluation, signed September 1, 2009 (LORENZO-PEREZ 002655-002657);
4. Psychological Data System Eval/Report, dated June 17, 2009 (LORENZO-PEREZ 004234);
5. Behavioral Health Transfer Summary, signed July 9, 2012 (LORENZO-PEREZ 002658-002661);
6. Incident Report, May 1, 2013 (LORENZO-PEREZ 00132-00133);
7. Psychiatric Evaluation, signed May 29, 2013 (LORENZO-PEREZ 000116-00120);
8. Incident Report, dated November 25, 2013 (LORENZO-PEREZ 00121-00122);
9. Incident Report, dated January 26, 2015 (LORENZO-PEREZ 00389-00390;
10. Clinical Intervention – Clinical Contact, dated April 20, 2015 (LORENZO-PEREZ 004086;
11. Curriculum Vitae of Dr. Ubaldo Bocanegra;
12. Bureau of Prisons Medical, Central, and Psychological Data Systems (PDS) Files for Mr. Lorenzo-Perez (on CD and Bates Stamped LORENZO-PEREZ 000001-004259).[1]

---

[1] Exhibits 3-10 are pages from Exhibit 12, Respondent's Medical, Central and PDS files.

B.  **Underlying Criminal Judgment**

Lorenzo-Perez is serving a 495-month sentence for two counts each of Conspiracy to Commit Hostage Taking and Aiding and Abetting in the Use of a Machine Gun During the Commission of a Crime of Violence.  (Doc. No. 1, Ex. A.)  Lorenzo-Perez began serving his sentence on April 30, 1999, and the Bureau of Prisons calculates his good conduct release date to be September 16, 2033. *Id.*[2]

C.  **Respondent's Course of Incarceration**

1.  **Transfer to Rochester FMC**

Lorenzo-Perez was transferred from the Federal Correctional Institution in Gilmer, West Virginia ("FCI Gilmer") to FMC Rochester on August 20, 2009. (Ex. 2 at 3; Tr. at 17–18.)  His prison records do not denote mental-health problems before 2009, when he showed the significant mental-health deterioration that prompted his transfer to FMC Rochester.  (*Id.*)

Prison records indicate that Lorenzo-Perez was transferred to suicide watch at FCI Gilmer in June 2009, after he told a fellow inmate he wanted to say goodbye to family members and give away his property. (*Id.*)  While on suicide watch, he showed continued deterioration, including making statements that

---

[2]  At the hearing, Lorenzo-Perez's counsel indicated that the Respondent may separately object to the government's calculation regarding the length of his sentence. (Tr.  of June 1, 2015 Hr'g ("Tr.") 38–39.) Counsel agreed, however, that any dispute regarding the precise length of his remaining prison term is not relevant to this dispute, and he acknowledges that more than 10 years remains to be served on his sentence.  (*Id.*)

3

people wanted to harm him. (Tr. at 17.) He also displayed signs of hypomania, psychosis and possible suicidality. (Ex. 2 at 3.) The severity of his deterioration prompted his transfer to a private hospital, where he exhibited pressured speech and the paranoid ideation that his hospital gown was infected with AIDS and Hepatitis C. (*Id.* at 3-4.) He neither slept nor used the bathroom; and he spit at a physician. (*Id.*) He was involuntarily administered psychiatric medication on an emergency basis. (*Id.*; Tr. at 18.)

Lorenzo-Perez was diagnosed with schizoaffective disorder, bipolar type. (*Id.*) Due to the severity of his disorder, he was transferred to FMC Rochester to be further evaluated for psychiatric treatment. (*Id.*) He required emergency psychiatric medication to complete his transfer. (Ex. 2 at 4.)

### 2. Respondent's Assigned Treatment Team at FMC Rochester

At FMC Rochester, Lorenzo-Perez has been assigned to a treatment team that includes Dr. Melissa Klein, a psychologist, and Dr. Ubaldo Bocanegra, a psychiatrist, among others. (Tr. at 8–11.) Dr. Klein has treated Lorenzo-Perez since October of 2012, and Dr. Bocanegra has been part of the treatment team since he replaced the Dr. Maldonado, who retired, in July 2014. (*Id.*[3]) Both doctors see Lorenzo-Perez regularly when he is in open housing and almost daily when he is in the locked housing unit (also referred to as the Special

---

[3] Dr. Klein speaks Spanish when treating Lorenzo-Perez, whose English is very limited. (Tr. at 11.) Dr. Bocanegra is a native Spanish-speaker. (Tr. at 57.) When necessary, Dr. Bocanegra assists Dr. Klein with translation. (Tr. at 11.)

4

Housing Unit, or "SHU").[4]  (Tr. at 10 and 57.)

### 3. Respondent's History at FMC Rochester

After his transfer to FMC Rochester, Lorenzo-Perez voluntarily accepted medications for a short period of time.  (Tr. at 19–21.)  He showed relative improvement in his mental condition and was able to transfer from SHU to the open housing unit at FMC Rochester. (*Id.*)  Even during this period of relative stability, however, he continued to express paranoid thoughts, including repeatedly requesting AIDS testing and refusing to take hypertension medication, stating, "I know you want to kill me with these medications."  (*Id.*)

Nevertheless, as a result of the relative stability he demonstrated, Lorenzo-Perez was transferred from an inpatient to an outpatient designation in 2012, and his diagnosis was updated to note that his psychotic disorder was in full remission.  (Tr. at 21–23; Ex. 5.)  Lorenzo-Perez remained at FMC Rochester so he could continue to be monitored and receive mental-health services and programming and because the type of mental-health disorder with which he was diagnosed tends to be lasting notwithstanding occasional periods of remission.  (*Id.*)

That apparent remission ended on May 1, 2013, when Lorenzo-Perez

---

[4]  In SHU, Lorenzo-Perez is confined to his cell except for an hour per day of outdoor recreation time, which he typically refuses, and showers.  (Tr. at 35–36.)  In contrast, in the open housing unit, doors are not typically locked and inmates may socialize with one another, go outside onto the grounds, walk in the "rec yard," go to the gym, and have access to the vocational workshop, leisure programming, and group therapy, among other things.  (*Id.*)

fought another inmate. (Tr. at 24–25.) Lorenzo-Perez stated that the inmate had been hired to harm him. (*Id.*) He was not sanctioned for the fight because he was found not competent to participate in disciplinary proceedings. (*Id*; Ex. 6.) Lorenzo-Perez was readmitted into inpatient services and again diagnosed with schizoaffective disorder, bipolar type. (Tr. at 26.) He was placed in SHU, where he displayed disorganized and paranoid behaviors for which he was emergently medicated on May 6, 2013. (Ex. 2 at 6; Ex. 7.) He remained in SHU for about two months because he was deemed a risk to himself or others. (Tr. at 27.)

Lorenzo-Perez took part in a second, similar fight on November 25, 2013. (Tr. at 26–28; Ex, 2 at 7.) He said that he believed that staff members had paid the other inmate thousands of dollars to kill him. (*Id.*) He was emergently medicated when returned to SHU. (Tr. at 28.) Lorenzo-Perez voluntarily accepted medication for a period of time after receiving emergency medication, and was released back into the open housing unit about three and a half months after his admission. (*Id.*) He was again found not competent to participate in disciplinary proceedings. (Ex. 8.)

Lorenzo-Perez fought another inmate on January 23, 2015. (Tr. at 29; Ex. 2 at 8.) Similar to the earlier fights, he said that he believed that the other inmate had been sent by "administration" to kill him. (Ex. 2 at 8; Tr. at 29–30.) He was again found not competent to participate in disciplinary proceedings. (Ex. 9.) Lorenzo-Perez was placed into SHU, where he remained through the date of the hearing in this matter. (Tr. at 34.)

Prior to the January 23, 2015 fight, Lorenzo-Perez's functioning had been deteriorating. (Tr. at 29–30; Ex. 2 at 8.) He had begun spending his nights mostly awake in a chair outside his cell rather than sleeping in his bed because he feared that lasers were being passed through his cell windows and would burn him if he slept in his bed. (*Id.*) Around that same time, he expressed fear of being sprayed with and harmed by pesticides and refused to eat or drink enough food or fluids because he feared they contained poison. (*Id.*) He had previously received intravenous fluid involuntarily to prevent or reduce damage resulting from his inadequate eating and drinking. (*Id.*)

Those paranoid delusions worsened after the January 23, 2015 fight. He was seen bathing in toilet water and he refused to use the shower, stating "you are trying to kill me by putting poison and disease inside the tubes and when I shower I'll die from disease" and "even you using your machine you are not been able to kill me." (Ex. 2 at 9.) He has received two involuntary psychiatric medications since the January 23, 2015 fight due in significant part to his problems with inadequate eating, drinking, and self-care, including his refusal to shower. (Tr. at 52–54.) Following the involuntary medications, he began showering and eating more of his foods, but he continued to say that he believed that his name is in a machine that has been trying to kill him for the past six years. (*Id.*) He is now in a near constant state of agitation as a result of his delusion that he will soon be killed. (*Id.*)

### D. Lorenzo-Perez's Mental Health

Drs. Klein and Bocanegra both testified that Lorenzo-Perez suffers from schizoaffective disorder, bipolar type. (Tr. at 12–13 and 57.) Dr. Klein testified that schizoaffective disorder involves symptoms of both schizophrenia and bipolar disorder. (*Id.*) Schizophrenia involves a cluster of symptoms, including two or more of the following: hallucinations, delusions, disorganized speech, disorganized behaviors and negative affect.[5] (*Id.*) When there is also a prominent mood disorder, a person qualifies for the schizoaffective disorder diagnosis. (*Id.*) Dr. Klein testified that Lorenzo-Perez showed a history of manic symptoms, including elevated mood, grandiosity, irritable mood and increased energy despite going days without sleep. (Tr. at 13–14; Ex. 2 at 6 and 11.)

Lorenzo-Perez's first reported indication of schizoaffective disorder occurred in June of 2009, when he began reporting persecutory ideas that people were trying to kill him. (Tr. at 15.) At about that time, he first expressed his belief that staff wanted to infect him with HIV, AIDS or Hepatitis C. (*Id.*) Those persecutory ideas have persisted. On three occasions he has fought inmates he believed were paid to kill or harm him. He also has persistent delusions that his medicine, food, and water are poisoned and that lasers will burn him. This has caused him to require emergency medication on multiple

---

[5] Dr. Klein indicated that she relied upon the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, which is generally relied upon in here field, in reaching her diagnosis. (Tr. at 14; Ex. 2 at 10.)

8

occasions and has prevented him from taking medications consistently and in the appropriate dosage, which is required for such medications to treat his condition.

Lorenzo-Perez has exhibited other disorganized speech and behaviors, including responding to internal stimuli—specifically, hearing and responding to voices that aren't there and talking to an angel that he believed was his son. (Tr. at 15 and 43; Ex. 2 at 3, 6 and 8–9.)

### E. History of Refusing Medication

Although psychological services and group treatments can be effective, the primary treatment for schizoaffective disorder, bipolar type is antipsychotic medication. (Tr. at 32.) Although he is prescribed such medication, Lorenzo-Perez does not accept it regularly enough for it to be effective or to enable him to participate in other therapies. (Tr. at 33.)

Dr. Bocanegra testified that he has prescribed multiple medications to treat Lorenzo-Perez, including Seroquil, an antipsychotic medication that primarily targets delusions and hallucinations and also addresses the mood and cognitive functions of the disorder. (Tr. at 58. He also prescribes Propanolol and Cogentin to treat Lorenzo-Perez's movement disorders.[6] (*Id.*) In addition, Clonopine and

---

[6] Lorenzo-Perez periodically exhibits a shake, or tremor. (Tr. at 36–37, 61–62 and 66. The location and severity of the tremor fluctuates. *Id.* Its causes likely include anxiety, although it a possible side effect of some of the prescribed medications. (*Id.*) Lorenzo-Perez is prescribed medications to treat those tremors, but does not appear to regularly take them. (*Id.*) Dr. Bocanegra also testified that a sudden drop in certain medications, including the medication he was emergently treated with in April, could also cause the tremors to increase. (*Id.* at 61.)

Clonazepam are prescribed to target anxiety. (*Id.*) Dr. Bocanegra explained that the medications must be taken consistently and in the required dosage to be effective. (Tr. at 59–60.) Lorenzo-Perez frequently refuses to accept prescribed medications. (Tr. at 31–32 and 59–60.) Even when he has accepted them from the nursing station, he often does not ingest them. (*Id.*) He has dumped his pills into his toilet, sometimes in front of nursing staff. (*Id.*) And on other occasions, he has "cheeked" his medication before spitting it out after leaving the medication line. (Tr. 31–32.)

Dr. Bocanegra explained that, as a result, Lorenzo-Perez is not receiving the proper dosage of his prescribed medications and is not taking them long enough to be effective. (*Id.* at 59–63.) Moreover, the inconsistency with which Lorenzo-Perez takes the medications also prevents his psychiatrist from effectively evaluating their effectiveness. (Tr. at 63.) If forcible medication were authorized, antipsychotic medications could be injected or staff could monitor swallowing to assure compliance. (Tr. at 63–64.)

## II.  DISCUSSION

### A.  Standard

Under 18 U.S.C. § 4245, a prisoner serving a sentence in federal prison "may not be transferred to a mental hospital without the prisoner's consent or a court order." *United States v. Watson*, 893 F.2d 970, 975 (8th Cir. 1990), *vacated in part on other grounds by, United States v. Holmes*, 900 F.2d 1322 (8th Cir. 1990). If the prisoner objects, the government may petition for a hearing on the

10

prisoner's present mental condition to determine "if there is reasonable cause to believe that the person may presently be suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility."  18 U.S.C. § 4245(a).

To that end, the Court determines: 1) whether Respondent suffers from a mental disease or defect; 2) if so, whether he is in need of custody for care or treatment of that mental disease or defect; and 3) if so, whether FMC Rochester is a suitable facility.  18 U.S.C. § 4245(d); *U.S. v. Horne*, 955 F. Supp. 1141, 1144 (D. Minn. 1997).  The government bears the burden to show each of these by a preponderance of the evidence.  *Id.*

As is set forth below, the Court finds that the government has met its burden.

### B. Lorenzo-Perez Suffers From A Mental Disease or Defect

The Court finds by a preponderance of the evidence that Lorenzo-Perez suffers from the mental disease of schizoaffective disorder, bipolar type. Dr. Klein testified that schizoaffective disorder, bipolar type involves a cluster of symptoms, including two or more of the following: hallucinations, delusions, disorganized speech, disorganized behaviors and negative affect.  To satisfy the criteria, an individual must also experience a mood disorder.

At the hearing, both Dr. Klein and Dr. Bocanegra testified that, to a reasonable degree of certainty, Lorenzo-Perez suffers from schizoaffective disorder, bipolar type.  Dr. Klein detailed numerous incidents in which Lorenzo-

11

Perez experienced delusions, disorganized speech and behaviors, and hallucinations. The most frequent examples include his persistent delusions that the prison staff is seeking to harm or kill him by, among other things: paying prisoners to harm or kill him; poisoning him through medication, food or fluids; attempting to infect him with AIDS or Hepatitis C; putting pesticides in the shower and burning him with lasers. He believes his name has been in a machine for six years, which is why the government is attempting to kill him.

Dr. Klein also testified that Lorenzo-Perez has demonstrated symptoms of hypomania, including elevated mood, grandiosity, irritable mood and increased energy despite going days without sleep.

Based on the expert report of Drs. Klein and Bocanegra, and on their testimony and the record, the Court concludes that the government has satisfied its burden of showing by a preponderance of the evidence that Lorenzo-Perez is suffering from a mental disease.

### C. For Which He Is In Need of Custody for Care or Treatment

The Court further concludes that Lorenzo-Perez is "in need of custody for care or treatment" of his mental disease or defect. Whether a person is in need of care or treatment is a question of fact left to the judicial decision-maker. *Watson*, 893 F.2d at 972. Section 4245 does not expressly define the meaning of this phrase, but judicial decisions provide guidance.

In *Horne*, the court described a "continuum of need" ranging from "something that is merely beneficial to something that is absolutely required." 955

F. Supp. at 1147. Treatment crosses the threshold of "needed" if such treatment is "more than merely beneficial" to the prisoner. *Id*; *see also United States v. Eckerson*, 299 F.3d 913 (8th Cir. 2002) (applying the legal standard adopted in *Horne* for determining whether an inmate is in need of treatment). The Eighth Circuit has held that need is established if treatment would enable a prisoner to function in the general prison population. *Watson,* 893 F.2d at 982 (commitment and treatment to restore a prisoner's ability to function in the general prison population is permissible).

The "in need of custody" threshold can also be met where "a prisoner whose mental illness was left untreated would pose a danger to himself or others if placed in the general prison population. . . ." *Id.* at 1149; *see also United States v. Clark,* 122 Fed. App'x 282, 283 (8th Cir. 2005) (affirming granting of § 4245 petition where the inmate's "paranoid and delusional thinking prevented him from making rational decisions about his medical care"). "A finding of dangerousness, however, is not required." *United States v. Riley*, No. 08-cv-171 (RHK/AJB), 2008 WL 974839, at *3 (D. Minn. April 8, 2008); *Horne,* 955 F. Supp. at 1147.

Here, the government has established by a preponderance of the evidence that Lorenzo-Perez is in need of custody for care or treatment pursuant to section 4245. Drs. Klein and Bocanegra both testified that Lorenzo-Perez's delusions have prevented him from, among other things: recognizing that he suffers from a psychological disease; taking medication to treat that psychological disease;

13

eating and sleeping properly; and participating in group or other therapies. (Tr. at 34–35, 59–63; Ex. B at 11–12.) As a result, he suffers debilitating paranoid delusions that cause him to attack other inmates. To prevent such attacks, Lorenzo-Perez has been repeatedly housed in SHU for months on end.[7] Although necessary, such isolation is not helpful to his recovery. (Tr. 35–36, 64; Ex. 2 at 11–12.)

In addition, his lack of insight into his mental condition and his belief that his prescribed medications are poison prevent him from meaningfully participating in his recovery. (Tr. at 34–36.) His frequent refusal to take prescribed medications not only makes such medications ineffective, but it also prevents his psychiatrist from properly evaluating the efficacy of the medications being prescribed.[8] (Tr. at 59–63.)

As a result, the government has established the need for custody for care or treatment based both on Lorenzo-Perez's inability to function in the open housing unit without treatment and the danger that he poses to himself and

---

[7] The Court finds that enabling Lorenzo-Perez to function in the open housing unit at FMC Rochester would be analogous to enabling him to function in the general prison population as is discussed in *Horne*. In open housing, he would no longer be limited almost exclusively to his cell; he could socialize with other inmates and make use of various amenities that are available to inmates in open housing but not to those in SHU. *See* n.4, *supra*.

[8] As Dr. Klein acknowledged, the Court would not, by granting the government's Petition, specifically require Lorenzo-Perez to take any particular medication. (Tr. at 54.) But granting the Petition would enable the government to conduct a "Due Process Hearing" to determine whether he meets the criteria required in order to forcibly medicate him other than emergently. (*See id.*)

14

others as the result of his mental disease.

### D. FMC Rochester Is A Suitable Facility.

The Court further finds that FMC-Rochester is a suitable facility for Lorenzo-Perez's care and treatment. Dr. Klein testified that FMC Rochester is, at its mission, devoted to providing mental-health care for severe and persistent mental disorders, and has the ability and the staffing to provide psychiatric care, psychological care, skilled nursing care and active programming to provide for the needs of individuals such as Lorenzo-Perez, who require such treatment. Dr. Klein explained the array of mental health care available to Lorenzo-Perez (Tr. at 34–36), and she described the "team" that provides him with care, which includes nursing staff, social work staff, psychological and psychiatric services (*id.* at 8–9.) No contrary evidence was offered.

## III. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. The government's Petition To Determine Present Mental Condition Of An Imprisoned Person Under 18 U.S.C. § 4245 (Doc. No. 1) be **GRANTED** based on findings that: (a) Respondent suffers from a mental disease or defect; (b) is in need of custody for care or treatment of that mental disease or defect; and (c) that FMC Rochester is a suitable facility for such care and treatment; and

2. Respondent be committed to the custody of the United States Attorney General pursuant to 18 U.S.C. § 4245 for hospitalization and treatment until Respondent is no longer in need of such custody for care and treatment.

Date: August 11, 2015

                                                    s/ Jeffrey J. Keyes
                                                    JEFFREY J. KEYES
                                                    United States Magistrate Judge